UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

---

New Richmond Parents For Strong
Schools, UA.,

          Plaintiff,

v.

School District of New Richmond Board
Of Education,

          Defendant.

Case No. 3:26-cv-316-wmc

**REPLY MEMORANDUM IN SUPPORT OF MOTION TO DISMISS**

---

## INTRODUCTION

The briefing by Plaintiff New Richmond Parents for Strong Schools UA (the "Association") asks this Court to disregard a decade of legal precedent regarding transgender students' bathroom access and turn the anti-discrimination provisions that are intended to shield students from discrimination into a sword to discriminate against transgender students. Rather than meaningfully confronting the deficiencies of its claims, the Association seeks to expand the plain meaning of recent cases and ignores the factual allegations in its Complaint in an effort to save its baseless claims. This does not change the mandatory result: the Association's Complaint must be dismissed as it fails to state a claim upon which relief can be granted.

1

## ARGUMENT

**I.**    **Neither *B.P.J.* Nor *Louisiana* Abrogate this Circuit's Binding Title IX Holdings in *Whitaker* and *A.C.***

The Seventh Circuit's Title IX holdings in *Whitaker v. Kenosha Unified School District No. 1 Board of Education*, 858 F.3d 1034 (7th Cir. 2017), and *A.C. v. Metropolitan School District of Martinsville*, 75 F.4th 760 (7th Cir. 2023), have not been abrogated by the United States Supreme Court's recent decisions in *West Virginia v. B.P.J.*, 225 L. Ed. 2d 1040 (2026)[1] and *Department of Education v. Louisiana*, 603 U.S. 866 (2024). The Association's proclamations to the contrary are the result of wishful thinking and its own failure to substantively engage with the legal reasoning underpinning *B.P.J.*, *Whitaker,* and *A.C.* Doc. 17 at 7, 9. A cursory read of *B.P.J.* makes clear that the Supreme Court decided only the narrow question of whether schools may maintain sex-segregated sports teams under Title IX, and the Court expressly disclaimed that it was deciding other Title IX legal issues. Despite the pages of digital ink the Association has spilled arguing that this Court should be the first to determine that *B.P.J.* and *Louisiana* should be read to abrogate *Whitaker* and *A.C.*'s Title IX holdings, the plain language of the *Whitaker* and *A.C.* decisions confirms they were decided on alternate grounds from *B.P.J.* and said nothing with respect to the rules at issue in *Louisiana*. *Whitaker* and *A.C.*'s Title IX holdings remain good law and are binding upon the District and this Court.

---

[1] The Supreme Court decided *B.P.J.* on June 30, 2026, eighteen days after the District initially filed its Motion to Dismiss.

### A. B.P.J. *is Expressly Limited to the Question of Whether Schools May Maintain Sex-Segregated Athletic Teams.*

In *B.P.J.*, the United States Supreme Court held that schools may maintain sex-segregated sports teams under Title IX. *See* 225 L. Ed. 2d at 1051-52. That decision said nothing about bathroom access for transgender students under Title IX.

The sole question before the Court in *B.P.J.* was "Under Title IX and the Equal Protection Clause of the Fourteenth Amendment, may schools maintain women's and girls' sports for biological females?" *Id.* The Association nevertheless asserts that the "Court's reasoning [in *B.P.J.*] applies fully to the bathroom context, and so directly abrogates *Whitaker* and *A.C.*" Doc. 17 at 8. This is simply untrue. The Supreme Court repeatedly emphasized that "the only question here is whether schools may limit women's and girls' sports to biological females." *B.P.J.,* 225 L. Ed. 2d at 1058; *see also id*. at 1090 (Sotomayor, J. concurring in part and dissenting in part).

Moreover, the Supreme Court repeatedly stressed that its reasoning was restricted to the issue of sex-segregated sports teams and cautioned against applying its reasoning beyond this specific context. *See id.* at 1052 n. 2 ("these cases do not present the distinct question of whether, under the Equal Protection Clause, schools may allow biological males who identify as female to participate on girls' and women's sports teams…"). Such context is clear in the Court's discussion of "the distinctiveness of competitive sports," including that they are often "zero sum" in which one athlete displaces another athlete. *Id*. at 1057. As Justice Gorsuch noted in his concurrence "the question [of] [w]hether other policies and practices might or might not qualify as unlawful discrimination … must be

assessed with reference to the policies in question and according to the relevant law's terms." *Id*. at 1070-1071 (internal quotations omitted).

In arguing that *B.P.J.* abrogates *Whitaker* and *A.C.*'s Title IX holding, the Association ignores the Supreme Court's unequivocal statements that this decision applies only to the question of whether schools may maintain sex-segregated athletic teams without violating Title IX. Federal courts, including the Supreme Court, are bound by the party-presentation principle, which holds that courts may decide only the questions presented to them. *See U.S. v. Sineneng-Smith*, 590 U.S. 371, 375-376 (2020). *B.P.J.* is a narrow decision about schools' ability to provide sex segregated athletic teams for female students. As the Supreme Court made clear, its reasoning applies only to that specific context. *B.P.J.* has no bearing on the reasoning that underpins *Whitaker* and *A.C.*'s holdings with respect to bathroom access for transgender students.

## B. B.P.J. *Does Not Abrogate* Whitaker *or* A.C. *Because They Relied on Alternate Reasoning.*

Assuming *arguendo* that *B.P.J.*'s reasoning can be grafted onto the issue of bathroom access under Title IX, it still has no effect on the continued validity of *Whitaker* or *A.C.* This is because neither *Whitaker* nor *A.C.*'s Title IX holding was based on defining "sex" to include gender identity.

In *Whitaker*, the Seventh Circuit concluded Title IX prohibits policies that bar students from accessing bathrooms consistent with their gender identity. *Whitaker* did not consider whether the word "sex" in Title IX includes gender identity. Instead, it held that policies that ignore gender identity "punish individuals for gender non-conformance" and

4

subject transgender students "to different rules, sanctions and treatment than non-transgender students." *Whitaker*, 858 F.3d at 1049-50. In doing so, the Seventh Circuit expressly acknowledged that neither Title IX nor its implementing regulations "define the term 'sex'." *Id*. at 1047.

Looking to its decision in *Ulane v. Eastern Airlines, Inc.*, 742 F.2d 1081 (7th Cir. 1984), for guidance, the Seventh Circuit noted that under Title VII it had "concluded" that the prohibition on sex discrimination "should be 'given a narrow, traditional interpretation, which would also exclude transsexuals'" because "Title VII's prohibition on sex discrimination 'implies that it is unlawful to discriminate against women because they are women and against men because they are men.'" *Id*. (internal citation omitted). Nevertheless, in *Whitaker*, the Seventh Circuit concluded that a "narrow, traditional interpretation" of sex "cannot and does not foreclose…transgender students from bringing sex-discrimination claims [under Title IX] based upon a theory of sex-stereotyping" because the Supreme Court and other federal courts of appeal had permitted discrimination claims based on a sex-stereotyping theory under Title VII. *See id*. at 1047-48. Applying only the sex-stereotyping paradigm to the plaintiff's sex discrimination claim, the Seventh Circuit concluded that bathroom policies that treat transgender students differently than other male or female students run afoul of Title IX. *Id*. at 1049-50.

The Seventh Circuit applied the same sex-stereotyping analysis in *A.C. See* 75 F.4th at 769-70. Explaining the legal framework set forth in *Whitaker*, the court noted that when analyzing a claim for sex discrimination against transgender individuals under Title IX, it asks whether the transgender plaintiffs are being denied "equal access to school programs

5

for behavior that is being tolerated in…students who are not transgender." *Id*. at 769. Thus, the bathroom and locker room policies at issue in *A.C.* violated Title IX, not because "sex" under Title IX includes "gender identity," but because the plaintiffs were "punished by the school districts' access policies" and "treated worse than a similarly situated person because of [their] sex." *Id*. at 772.

By contrast, *B.P.J.*'s holding relies on alternate premises. First, the central component of the Supreme Court's decision permitting sex-segregated athletic teams under Title IX was the Court's conclusion that "sex" under Title IX means biological sex. *B.P.J.*, 225 L. Ed. 2d at 1056 (Holding that the term "sex" as used in the original legislation and regulations "cannot plausibly be interpreted to refer to anything other than biological sex"). *Whitaker* and *A.C.* were premised on a sex-stereotyping theory of discrimination, not a definition of "sex" that includes gender identity.

The second pillar of the Supreme Court's decision in *B.P.J.* was that Title IX specifically "authorizes separate men's and women's sports teams." *B.P.J.*, 225 L. Ed. 2d at 1058. The Court suggested B.P.J. could not raise a viable sex stereotyping claim precisely because Title IX specifically authorizes separate sports teams. *See id*. That reasoning does not affect *Whitaker* or *A.C.*'s sex stereotyping analysis. *See id*. The Supreme Court explained at length that Title IX includes the unique statutory provision that specifically allows for "reasonable provisions considering the nature of particular sports." *See* Educ. Amends. of 1974, Pub. L. No. 93-380, § 844 (the "Javits Amendment"); *Id*. at 1056. The Court explained that the Javits Amendment allows for the segregation of athletic teams based upon biological sex because sports present unique "safety and competitive fairness

6

issues…when females are forced to compete against males" and regulations designed to address those issues by excluding individuals who are not biological females from women's or girls' sports are thus reasonable. *Id.* at 1056.

By contrast, Title IX does not contain a comparable provision that allows for "reasonable provisions" related to bathroom or locker room access. *B.P.J.* is silent with respect to whether, in the absence of such a provision, a school district may enact policies that circumscribe access to school programs, opportunities, or facilities based upon a student's gender identity. Moreover, the majority's opinion did not speak to whether a transgender student may maintain a Title IX claim for sex discrimination under a sex stereotyping theory outside of the context of athletics. In short, *B.P.J.*'s holding does not undermine the legal theory underpinning *Whitaker* and *A.C.*'s Title IX holding. *Whitaker* and *A.C.* remain binding precedent on this Court and the District.

### C. *Louisiana Has No Bearing on* Whitaker *or* A.C. *Because It Did Not Decide Whether Title IX Prohibits Schools From Treating Transgender Students Differently Based on Sex Stereotypes.*

The Association also relies upon the Supreme Court's decision in *Department of Education v. Louisiana*, 603 U.S. 866 (2024), to argue *Whitaker* and *A.C.*'s Title IX holdings were "undermined" before *B.P.J.* was decided. Doc. 17 at 9. This too is a misrepresentation of the Supreme Court's decision.

*Louisiana* did not involve a claim of sex discrimination or sexual harassment under Title IX. Instead, the issue before the Supreme Court in *Louisiana* was whether the government was entitled to a partial stay of preliminary injunctions enjoining, in part, the

7

Biden administration's Title IX regulations. *Louisiana*, 603 U.S. at 867. One challenged regulation defined sex discrimination under Title IX to include "discrimination on the basis of sex stereotypes…sexual orientation, and gender identity." *Id*.; *see* 89 Fed. Reg. 33886 (2024). In a *per curiam* decision, the Court upheld the preliminary injunction with respect to this definition and two other provisions of the challenged regulations.[2] *Id*.

In enjoining the definition, however, the Court in *Louisiana* did not consider whether Title IX prohibits restricting bathroom access for transgender individuals. Nor did the Court offer an opinion on whether a transgender individual may bring a sex stereotyping claim under Title IX related a school's bathroom or locker room policy. The sole issue the Court ruled upon in *Louisiana* was whether a preliminary injunction was warranted while the lower federal courts considered challenges to the new 2024 Title IX rules. Despite the Association's contention to the contrary, the minimal analysis on a preliminary injunction does not undermine, and certainly does not abrogate, either *Whitaker* or *A.C.* because those cases involved an entirely different issue—whether a school district's bathroom policy restricting access for transgender students violated Title IX.

## II.    *B.P.J.* And *Skrmetti* Do Not Abrogate *Whitaker* Or *A.C.*'s Equal Protection Clause Holding.

Contrary to the Association's claims, *Whitaker* and *A.C.*'s Equal Protection holdings survive the Supreme Court's decision in *B.P.J.* and *United States v. Skrmetti*, 605 U.S. 495 (2025). Neither *B.P.J.* nor *Skrmetti* abrogate *Whitaker* or *A.C.*'s Equal Protection Clause

---

[2] In considering *Louisiana*, the Court should exercise "customary skepticism toward *per curiam* dispositions that lack the reasoned consideration of a full opinion." *United States Bancorp Mortg. Co. v. Bonner Mall P'ship*, 513 U.S. 18, 24 (1994).

holdings because neither considered the unique circumstances presented by bathroom access that formed the basis for the Seventh Circuit's rulings.

In conjunction with its Title IX holding, the Supreme Court in *B.P.J.* held sex segregated sports teams do not violate the Equal Protection Clause. *B.P.J.*, 225 L. Ed. 2d at 1058. Recognizing that sex-segregated sports teams create a sex-based classification that triggers intermediate scrutiny, the Supreme Court reasoned the classification survives heightened scrutiny because the interest in maintaining separate teams was substantially related to the states' stated interests of: (1) "preventing serious physical injuries to female athletes", (2) "preserv[ing] opportunities for female athletes to fairly compete and succeed", and (3) "promoting 'equal athletic opportunities for the female sex.'" *Id*. at 1059 (internal citation omitted). Notably, the Supreme Court once again made clear that its decision was limited to the context of sports teams, stating "[i]n the distinctive sports context…the States may treat all biological males the same and treat all biological females the same, given the inherent physical differences between biological males and biological females." *Id*. at 1062. Furthermore, it expressly left the door open to the possibility that in the case of "a typical…educational opportunity…equal protection often may require that the government generally treat an individual without regard to the individual's sex." *Id*. at 1061.

In *United States v. Skrmetti*, the Supreme Court held Tennessee's ban on the use of certain surgical and pharmacological treatments for minors to affirm their gender identity did not violate the Equal Protection Clause. 605 U.S. 495, 506 (2025). Perhaps most notably, the Supreme Court held Tennessee's gender-affirming care ban was not subject to

heightened scrutiny because it did not rest on sex-based classifications. *Id*. at 515. The *Skrmetti* majority based this holding upon the fact that Tennessee's gender-affirming care ban provided that "no minor" could be administered puberty blockers or hormones to treat gender dysphoria, which were determined to be classifications based on age and medical use, not sex. *Id*. at 511.

The Supreme Court also dismissed the *Skrmetti* plaintiffs' counter-argument that heightened scrutiny was warranted because Tennessee's law was based on sex stereotypes. *Id*. at 516-17. The Court held Tennessee's gender affirming care ban was not based on sex stereotypes because the classifications were not based on sex. *Id*. at 516. Nevertheless, the Court reaffirmed that a law "that classifies on the basis of sex may fail heightened scrutiny if the classifications rest on impermissible stereotypes." *Id*.

The Association asserts *B.P.J.* abrogates *Whitaker* and *A.C.* because it held sex segregated teams survive heighted scrutiny, in part, due to physical differences between males and females. *See* Doc. 17 at 11. And the Association claims *Skrmetti* undermines *Whitaker* and *A.C.* because the Court rejected the *Skrmetti* plaintiffs' argument that Tennessee's gender affirming care ban was based on sex stereotypes. *Id*. at 11-12. These arguments, like the Association's Title IX arguments, fail to recognize the Supreme Court's own limiting language in its opinions and the fact that *Whitaker* and *A.C.* were based on entirely different legal premises.

First, as with the Title IX holding, *B.P.J.*'s Equal Protection holding was limited to the context of athletics. While states may adopt laws or policies segregating sports teams on the basis of biological sex, the Equal Protection Clause "often may require that the

10

government treat an individual without regard to the individual's sex" where the issue is one of access to an educational opportunity. *Id*. at 1061. Put another way, while inherent physical differences between the sexes justify athletics policies that segregate individuals based on biological sex, such considerations do not *per se* justify a policy that relates to a non-athletics related educational opportunity, such as the use of bathrooms. Consequently *B.P.J.*'s holding has no effect on *A.C.* or *Whitaker*, which dealt with bathroom and locker room policies and provision of equal educational opportunities, not athletics. *See Whitaker*, 858 F.3d at 1051; *A.C.*, 75 F.4th at 765-66.

*Skrmetti*'s rejection of a sex-stereotyping argument also has no effect on *A.C.* or *Whitaker*'s continued validity. The Supreme Court did not conclude that sex stereotyping claims are not permitted under the Equal Protection Clause. Instead, it found that, as a factual matter, Tennessee's law did not rely on sex stereotypes. *See Skrmetti*, 605 U.S. at 515-517. By contrast, in both *Whitaker* and *A.C.*, the bathroom policies at issue demonstrated sex stereotyping because they required students to utilize bathrooms based on the gender markers listed on their birth certificates and thus subjected transgender students to disparate treatment based on their biological sex when compared to their similarly situated peers. *Whitaker*, 858 F.3d at 1051; *A.C.*, 75 F.4th 765-66, 772.

Finally, the Association suggests *Whitaker* and *A.C.* have been abrogated because the Supreme Court held in *Skrmetti* and *B.P.J.* that the laws at issue did not "classify on the basis of transgender status" and made clear that it had not previously "held transgender individuals are a suspect or quasi-suspect class." Doc. 17 at 12-13 (quoting *Skrmetti*, 605 U.S. at 517-18; *B.P.J.*, 225 L. Ed. 2d at 1064). The Association goes on to argue, "[i]f

separating sports teams based on sex does not discriminate based on gender identity, then neither do separate bathrooms." Doc. 17 at 13. This argument ignores the thrust of *Whitaker* and *A.C.*'s Equal Protection rulings. Neither *Whitaker* nor *A.C.* based their Equal Protection holdings on the theory that the bathroom policies classify students based on transgender status or that transgender individuals are a suspect or quasi-suspect class. In fact, in *Whitaker*, the Seventh Circuit expressly stated that it was not reaching the question of "whether transgender status is *per se* entitled to heightened scrutiny." *Whitaker*, 858 F.3d at 1051. Instead, both *Whitaker* and *A.C.*'s Equal Protection rulings relied on a determination that the plaintiffs had been subjected to *sex stereotyping* as a result of the bathroom policies, subjecting the plaintiffs to disparate treatment based on their biological sex compared to their similarly situated peers. *Whitaker*, 858 F.3d at 1051; *A.C.*, 75 F.4th 765-66, 772. As such, *Whitaker* and *A.C.*'s Equal Protection holding remains binding precedent and the Association's claims should be dismissed.

## III.    The Association Has Failed to Plausibly Allege That The District's Policy Violates Title IX.

### A.    *Whitaker and A.C. Bar the Association's Title IX Claim.*

The Association appears to acknowledge in its Response what the District has said all along—*Whitaker* and *A.C.* bar its Title IX claim. *See* Doc. 17 at 13 (noting the validity of the Association's Title IX claim "[o]nce *Whitaker* and *A.C.* are set aside…"). The viability of the Association's Title IX claim requires this Court to overrule a decade of Seventh Circuit precedent by holding that *Whitaker* and *A.C.* have been abrogated. But *Whitaker* and *A.C.* remain good law, and this Court has no power to independently overrule

the Seventh Circuit. Consequently, the only permissible result is dismissal of the Association's Title IX claim.

As explained in the District's Memorandum of Law in Support of Its Motion to Dismiss, the District cannot adopt a policy segregating its bathrooms and locker rooms on the basis of sex assigned at birth. Doc. 11 at 22-25. Adopting such a policy would require the District to violate Title IX precedent in this jurisdiction. *See Whitaker*, 858 F.3d at 1049-50; *A.C.*, 75 F.4th at 769, 772. Under both federal and Wisconsin law, the District must adhere to binding federal precedent unless there is a directly contrary United States Supreme Court decision. *See Wilson v. Cook Cty.*, 937 F.3d 1028, 1035 (7th Cir. 2019) (quoting *McClain v. Retail Food Emplrs. Joint Pension Plan*, 413 F.3d 582, 586 (7th Cir. 2005)); *Colby v. J.C. Penney Co.*, 811 F.2d 1119, 1123 (7th Cir. 1987); Wis. Stat. § 118.001; *see also Johnson v. Burmaster*, 744 N.W.2d 900, 904 n. 3 (Wis. App. 2007).

The Association contends the District can simply adopt a policy segregating bathrooms based on sex assigned at birth pursuant to Title IX's implementing regulation at 34 C.F.R. § 106.33. Doc. 17 at 13. But, if the District did so, it would violate federal precedent and the text of the regulation itself. 34 C.F.R. §106.33 states schools "*may* provide separate toilet, locker room, and shower facilities on the basis of sex…." (emphasis added). *Whitaker* and *A.C.* require the District to ensure equal access to bathrooms and locker rooms based on students' gender identity. *Whitaker*, 858 F.3d at 1049-50; *A.C.*, 75 F.4th at 769, 772. Moreover, the plain language of the regulation is permissive. Schools are not required to "provide separate toilet, locker room, and shower facilities on the basis of sex", instead they "*may*" provide such facilities if they choose to do so. 34 C.F.R. §106.33

(emphasis added). Numerous federal courts, including the Seventh Circuit, have reached exactly this conclusion. *See A.C.*, 75 F.4th at 769-770; *Parents for Privacy v. Barr*, 949 F.3d 1210, 1227 (9th Cir. 2020); *Doe v. Boyertown Area School District*, 897 F.3d 518, 533 (3rd Cir. 2018).

The District is bound to follow the law. And the law is clear; the District cannot legally implement a bathroom policy that segregates access based on sex assigned at birth. For this reason alone, the Association's Title IX claim must be dismissed.

### B.     *The District's Bathroom Policy Applies Equally to All Students*.

To state a sexual harassment and sex discrimination claim under Title IX, a plaintiff must plead sufficient facts showing the alleged harassment and discrimination were based on sex. *See Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 650 (1999); *Lucero v. Nettle Creek Sch. Corp.*, 566 F.3d 720, 731 (7th Cir. 2009) (sexual harassment); *Doe v. Columbia Coll. Chicago*, 933 F.3d 849, 854 (7th Cir. 2019) (sex discrimination). The Association asserts it has plausibly alleged the District's bathroom policy harassed and discriminated against female students because it is undisputedly one-sided and only adversely impacts girls. *See* Doc. 17 at 14-15. This is not so.

Throughout its Response to the District's Motion to Dismiss, the Association alleges the District's bathroom policy applies only to female students. *See* Doc. 17 at 3, 14, 26. In doing so, the Association blatantly ignores the facts alleged in the Association's own complaint. The District's policy, as stated in the Complaint, is that all students are allowed "to use bathrooms based on gender identity." Doc. 1 at ¶ 15. Under the policy, students who are late to class because they were accessing a single occupant bathroom will be

14

excused from receiving a disciplinary tardy, regardless of their sex. *Id.* at ¶ 56. The policy is not, as the Association now suggests in its Response, that "boys may use the girls' bathroom—and girls who are adversely affected by that may use one of the single-user bathrooms." Doc. 17 at 14. Instead, the District's policy is that any student, including Plaintiffs, may use the bathroom or locker room that is consistent with their gender identity. Doc. 1 at ¶¶ 15, 28, 55.

The Third and Ninth Circuits, as well as the United States District Court for the Northern District of Illinois, have all held that bathroom policies that permit students to access the bathroom and locker room that aligns with their gender identity do not involve animus on the basis of sex. *See Parents for Privacy v. Barr*, 949 F.3d 1210, 1228 (9th Cir. 2020); *Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 534-35 (3rd Cir. 2018); *F.F. v. Valley View Community Unit Sch. Dist. 365U*, 2026 U.S. Dist. LEXIS 154157 at *19-20 (N.D. Ill. July 13, 2026). While the Association is correct that these decisions are not binding on this Court, the Seventh Circuit has made clear that the decisions by the other federal courts of appeal must be given, "most respectful consideration" and district court decisions are entitled to respect, particularly when they are intra-circuit decisions. *Colby*, 811 F.2d at 1123-24; *see also Richards v. Local 134, Int'l Brotherhood of Electrical Workers*, 790 F.2d 633, 636 (7th Cir. 1986) (explaining district court judges are bound by the same principle). Consequently, absent binding Seventh Circuit precedent, this Court must look to these decisions for guidance in ruling on the District's motion.

Both the Third Circuit in *Doe v. Boyertown Area School District and* the Ninth Circuit in *Parents for Privacy v. Barr* held that bathroom policies allowing all students to

use facilities consistent with their gender identities did not discriminate on the basis of sex because they applied equally to all students. *Doe*, 897 F.3d at 524; *Parents for Privacy*, 949 F.3d at 1228. And, in the time since the District filed its initial brief, the Northern District of Illinois joined the growing list of courts rejecting the exact claims the Association makes here. In *F.F. v. Valley View Community Unit Sch. Dist. 365U*, the court  dismissed Title IX harassment and discrimination claims nearly identical to the claims presented here, reasoning the plaintiff could not show the school district's policy allowing all students "access to the restroom that aligns with [their] gender identity" constituted sexual harassment or sex discrimination since the school district's policy "guarantees all students equal rights provided under [Title IX]." 2026 U.S. Dist. LEXIS 154157 at 18-19. *F.F.* is particularly instructive because it was decided post-*B.P.J.* and confirms that *B.P.J.* is limited to sports. *Id*. at 22.

The Association has failed to allege the District's bathroom policy treats male and female students differently, as necessary to state cognizable sexual harassment and sex discrimination claims. To sustain a Title IX claim, it is not enough for the Association to repeatedly claim that "a boy uses the girls' bathroom, and no girl uses the boys' bathroom" and that as a result only girls are required "to wait in line, arrive late to class, and experience anxiety." Doc. 17 at 15-16.

It is equally insufficient for the Association to assert that there is an "asymmetrical" privacy issue connected to "differences in physical vulnerability and the statistical realities of sexual violence" when Title IX "does not create distinct 'bodily privacy rights' that may be vindicated" through a sex discrimination claim. Doc. 17 at 14; *Parents for Privacy*, 949

16

F.3d at 1227. There are no allegations in the Complaint that any member of the Association has been sexually assaulted, threatened with sexual assault, or has any reason to believe they are at a heightened risk of sexual assault in the school bathroom as compared to any other public place. The lack of basis in the Complaint for this claim is reason alone to reject it. However, it merits mention that the Association's insinuation that allowing gender-affirming bathroom access increases the risk of sexual violence (*see* Doc. 17 at 14) has no factual basis.[3]

Instead of inventing new privacy standards, the Association must allege that the District has enacted a policy that actually targets female students or treats them differently. Nowhere in the Complaint are such facts present. The Complaint is devoid of any allegation that the District has or would enforce its bathroom policy differently if a transgender male student opted to use male bathrooms or locker rooms. And there are no allegations reflecting that the District has punished female students, or any student, for using any restroom or locker room. The fact of the matter is, despite the Association's attempt to rewrite history, policy, and its own Complaint, the District's bathroom policy permits all students to use facilities consistent with their gender identity or a single-occupant bathroom. Such a policy is consistent with Title IX and does not harass or discriminate against any student on the basis of their sex, including the Association's student members.

---

[3] If student safety is truly the motivating concern, it's relevant to consider that transgender individuals over the age of 16 are 2.5 times more likely than their cisgender peers to be victims of violence, including sexual assault. Jennifer L. Truman et al., *Violent Victimization by Sexual Orientation and Gender Identity, 2017-2020*, U.S. Dep't of Justice, Bureau of Justice Statistics, NCJ304277, at 1-2 (2022).

The Association's baseless sexual harassment and sex discrimination claims must be dismissed.

### C.   Female Students Have Not Lost Educational Opportunities Because of Severe, Pervasive, or Objectively Offensive Conduct.

The Association further attempts to salvage its sexual harassment claim claiming the "Complaint alleges far more than generalized discomfort" on the part of female students. Doc. 17 at 18. But this ignores both the facts alleged in the Complaint and the law regarding what constitutes severe, pervasive, and objectively offense conduct that denies students educational opportunities.

Courts have set a high bar for finding severe, pervasive, and objectively offensive conduct. *See e.g., Davis*, 526 U.S. at 653; *Doe v. Galster*, 768 F.3d 611, 618 (7th Cir. 2014); *Trentadue v. Redmon*, 619 F.3d 648, 653-54 (7th Cir. 2010). And in cases with claims identical to those here, courts have rejected the argument that students' feelings of embarrassment, anxiety, fear, and loss of dignity connected to a transgender student accessing bathrooms or locker rooms consistent with their gender identity alleges severe, pervasive, or objectively offensive conduct. *See Parents for Privacy*, 949 F.3d at 1219; *F.F.*, 2026 U.S. Dist. LEXIS 154157 at 16, 19. Students' discomfort with the ordinary use of facilities by transgender students is not severe, pervasive, or objectively offensive conduct. *Parents for Privacy*, 949 F.3d 1229. As the Third Circuit succinctly pointed out, "an assertion that a cisgender student was harassed merely by a transgender student washing that student's own hands in a bathroom or changing in the locker room…is not the type of conduct that supports a Title IX hostile environment claim." *Boyertown*, 897 F.3d at 536.

18

The categories of "actionable conduct" the Association identifies as severe, pervasive, and objectively offensive are twofold.  First, the Association claims the District's "deliberate policy decision" to enact and enforce its bathroom policy, even after receiving reports of concerns, amounts to severe, pervasive, and objectively offensive conduct. *See* Doc. 1 at ¶¶ 69-70; Doc. 17 at 19. And second, it alleges, just as in *Parents for Privacy*, that the mere presence of a transgender girl in the girls' bathrooms is severe, pervasive, and objectively offensive conduct because it allegedly causes girls to "experience anxiety," "feel displaced from a space that should feel safe and appropriate for girls use," and feel unsafe and undignified. *See* Doc. 1 at ¶ 67; Doc. 17 at 18.

Neither the District's decision to comply with binding legal precedent by enacting and maintaining its bathroom policy nor the presence of a transgender student in a bathroom qualify as severe, pervasive, or objectively offensive conduct. The Association cites no authority for, and no court has ever held, that a school's policy decision can rise to the level of severe, pervasive, or objectively offensive conduct. Moreover, the Association's specific claim that the District's policy is severe, pervasive, or objectively offensive conduct is particularly absurd in light of the fact that Title IX imposes no requirement that school districts provide sex-segregated bathroom and locker room facilities in the first place. And with respect to the Association's assertion that the presence of a transgender girl in the girls' bathroom is severe, pervasive, and objectively offensive conduct, such claims have been dismissed because they are nothing more than expressions by certain students that they are uncomfortable with a transgender student making use of a bathroom or locker room in the same manner as any other student.

Furthermore, the Association has not alleged sufficient facts suggesting there was a "concrete negative effect" on its members' education as a result of the alleged sexual harassment. *Gabrielle M. v. Park Forest-Chicago Heights*, 315 F.3d 817, 823 (7th Cir. 2003) (quoting *Davis*, 526 U.S. at 654). The Seventh Circuit standard for concrete negative effects on education requires more than embarrassment and inconvenience. *See Gabrielle M.*, 315 F.3d at 823 (explaining "dropping grades, becoming homebound or hospitalized due to harassment, or physical violence" are concrete negative effects); *Trentadue*, 619 F.3d at 654 (student failed to show concrete negative effects when she continued to earn high grades and attend school). Here, the Association asserts that avoidance of bathrooms, missing class time, and missing "portions of" a lunch period are all allegations of concrete negative effects sufficient to withstand the District's motion to dismiss. Doc. 17 at 18. These allegations, however, do not rise to the level of concrete negative effects showing denial of an education benefit or opportunity. Nothing in the Complaint or Plaintiff's Response indicate that female members of the Association have suffered decreases in their grades, missed meaningful amounts of class time that impacted their academic performance, or that they were not able to participate in mealtimes. Consequently, the Association has failed to plausibly allege the District's bathroom policy that complies with existing law created a sexually harassing environment that denied female students access to education opportunities and benefits.

#### D.    The District Had No Actual Knowledge of Nor Was Deliberately Indifferent to Harassment.

Despite Plaintiff's contentions to the contrary, the Complaint does not allege that District officials had actual knowledge of any alleged sexual harassment. To plausibly allege actual knowledge, the Association was required to allege sufficient facts indicating that the District received reports of or observed inappropriate behavior. *Gabrielle M.*, 315 F.3d at 823. Here, the District never received a report of harassment or inappropriate conduct involving a transgender student and members of the Association. Instead, it merely received requests for information regarding its bathroom policy and reports of concern about the simple fact of a transgender girl using girls' bathrooms. *See* Doc. 1. ¶¶ 27-30, 37, 52-56.

Nor does the Complaint plausibly allege the District acted with deliberate indifference to alleged harassment. The Association claims it plausibly alleged deliberate indifference because the District "[r]ather than investigate the concerns, provide an alternative that did not burden girls, or otherwise address the harms reported…maintained the challenged policy." Doc. 17 at 21. This claim, however, ignores one of the fatal flaws with the Association's Title IX claim—the District never received a report of harassment that required it to respond. Under *Davis*, the District is not required to respond to every "concern" raised by students and their parents. Instead, it is required to respond to known harassment. *Davis*, 526 U.S. at 647. Here, the District only received reports of concerns that parents disagreed with the policy, that parents disagreed with the District's approach to communicating its bathroom policy to them, and that a single student was being bullied

21

as a result of her mother's Facebook post. *See* Doc. 1. ¶¶ 27-30, 37, 52-56. Expressions of political or philosophical disagreement with a policy that is required by existing law and the District's communications about that policy are not reports of sexual harassment. Nor are reports of bullying considered "sexual harassment" where the allegations are only that the affected student was "criticized" and "threatened" by peers after her mother shared a Facebook post about the bathroom policy. *See Davis*, 526 U.S. at 652.

The District had no occasion to take action on any allegation of harassment because none were ever reported. The Association's sexual harassment claim must be dismissed.

## IV.    Female Students' Right To Privacy Was Not Violated.

The Association claims students have the right to be free from "exposure of their bodies and intimate activities to a person of the opposite sex" and that its members' privacy rights were violated by the District's bathroom policy.  Doc. 1 at ¶ 83, 86-88. A cursory review of caselaw confirms this is both an exaggeration of the right to privacy's recognized scope and that the Association's members' rights have not been violated.

As an initial matter, the Association disputes that it must prove that the District's enforcement of its bathroom policy "shocks the conscience." Doc. 17 at 24. The Association relies on the Seventh Circuit's statement in *Khan v. Gallitano*, 180 F.3d 829, 836 (7th Cir. 1999), that the "shocks-the conscience analysis was not generally applicable to substantive due process claims." *See also* Doc. 17 at 24. While the Association's quote of *Khan* is accurate, the Association's reliance on it is misplaced. The Seventh Circuit has been clear that the shocks the conscience standard applies to substantive due process claims under 42 U.S.C. § 1983 where the unconstitutional conduct the plaintiff complains of is an

executive action. *See Christensen v. Cnty. of Boone*, 483 F.3d 454, 462 n. 2 (7th Cir. 2007). The government action that Plaintiffs challenge here, the District's implementation of its bathroom policy with respect to its female students, is plainly an executive action as it is the application of a policy to a specific situation. *See*, *e.g.*, *Students and Parents for Privacy v. United States Dep't of Educ.*, No. 16-cv-4945, 2016 U.S. Dist. LEXIS 150011 at 96 (N.D. Ill. Oct. 18, 2016) (noting that a claim that a District's bathroom policy violated students' right to privacy was an executive action to which the shocks the conscience standard applies and that the plaintiffs were required to show that the policy shocked the conscience.) Consequently, the Association must have alleged sufficient facts to show the District's policy "shocks the conscience." However, even if the shocks the conscience standard does not apply as the Association claims, that does not change the fact that the Association has failed to allege sufficient facts that the right to privacy it is alleging the District violated is a fundamental right that is deeply rooted in the Nation's history and tradition. That failure, in and of itself, under either substantive due process standard, is a sufficient basis for this Court to dismiss Plaintiff's substantive due process claim.

Courts have not broadly recognized the expansive right to privacy that the Association alleges to be "deeply rooted in this Nation's history and tradition." *See* Doc. 17 at 22; *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997). Neither the U.S. Supreme Court nor the Seventh Circuit have determined that students have the right to privacy the Association alleges the Due Process Clause protects. And all but one of the federal appellate courts that have decided this issue have held that the right to privacy does not guarantee students the right to be free from exposure of their bodies and intimate

activities to a person of the opposite sex. *Parents for Privacy*, 949 F.3d at 1222; *Boyertown*, 897 F.3d at 531-32, *but see Adams v. School Board of St. Johns County*, 57 F.4th 791, 796, 804 (11th Cir. 2022) (suggesting students have a right to privacy in school that would justify a school district's policy of bathrooms segregated based on sex assigned at birth).

In support of its argument that the right to privacy "as to one's unclothed body and as to one's 'partially clothed body'" has been recognized in the context of schools, the Association cites *Adams*; *Doe v. Luzerne Cnty.*, 660 F.3d 169 (3rd Cir. 2011); *Poe v. Leonard*, 282 F.3d 123 (2d Cir. 2002); and *Brannum v. Overton Cnty. Sch. Bd.*, 516 F.3d 489 (6th Cir. 2008). Doc. 17 at 23. These cases, however, do not support a recognition of the right to privacy that is necessary to sustain the Association's claim. As previously discussed, while *Adams* does recognize a right to privacy in schools that permits sex segregated bathrooms, it provided no legal support for its assertion that such a right was widely recognized. *Adams*, 57 F.4th at 805. Both *Doe* and *Poe* were cases involving forced exposure of individuals' bodies to law enforcement solely for the gratification of the officers involved. *See generally Doe v. Luzerne Cnty.*, 660 F.3d 169 (3rd Cir. 2011); *Poe v. Leonard*, 282 F.3d 123, 129 (2d Cir. 2002). Neither *Doe* nor *Poe* discussed the scope of privacy rights which may exist in schools. Finally, *Brannum*, while a case involving schools, recognized students had a right "not to be videotaped while dressing and undressing in school athletic locker rooms" under the Fourth, not the Fourteenth Amendment. *Brannum*, 516 F.3d at 494. Simply put, there is no legal support for the Association's assertion of a right for students to be free from "exposure of their bodies and intimate activities to a person of the opposite sex" in schools.

24

Even assuming students did have the broad right to privacy the Association alleges, the District's bathroom policy does not infringe on that right. As the Seventh Circuit has noted, "[c]ommon sense tells us that the communal restroom is a place where individuals act in a discreet manner to protect their privacy and those who have true privacy concerns are able to utilize a stall." *Whitaker*, 858 F.3d at 1052. Providing "[g]ender-affirming facility access does not implicate the interest in preventing bodily exposure, because there is no such exposure." *A.C.*, 75 F.4th at 773; *see also Boyertown*, 897 F.3d at 532-33; *Parents for Privacy*, 949 F.3d at 1225. Nothing in the Complaint or the Association's Response to the District's Motion to Dismiss indicate that the Association's members or female students in the District are forced to expose themselves to other students. Simply put, the Complaint does not support an allegation that students are being denied a fundamental privacy right. The Association's privacy claim must similarly be dismissed.

## V.    The Bathroom Policy Does Not Violate the Equal Protection Clause.

Finally, the Association has failed to state a plausible sex discrimination claim under the Equal Protection Clause. Despite the Association's attempt to rewrite the District's bathroom policy and its own complaint to withstand the District's motion to dismiss, the allegations in the Complaint make clear that the District's bathroom policy is facially neutral and applies equally to all students, regardless of their sex or gender identity.

In its Response, the Association makes new allegations regarding the content of the District's bathroom policy in a contrived effort to advance its baseless Equal Protection Clause sex discrimination claim. The Association asserts the District's bathroom "policy is this: If a girl 'walks into the closest girls' bathroom and there is a male student she doesn't

25

feel comfortable with, she should walk out and can use the single-stall bathrooms,' and 'if she is late to class as a result, she could obtain a pass." Doc. 17 at 28. This is not the same policy described by the Association in its Complaint. Instead, according to the Association's Complaint, "the New Richmond School District has a policy allowing students to use bathrooms based on gender identity." Doc. 1 at ¶ 15; *see also* Doc. 1 at 23, 60.

On a motion to dismiss this Court is limited to the four corners of the Complaint to determine whether the Association has plausibly alleged sex discrimination under the Equal Protection Clause. *See Palda v. General Dynamics Corp.*, 47 F.3d 872, 875 (7th Cir. 1995). In its Complaint, the Association had every opportunity to allege that the District's policy was: "If a girl 'walks into the closest girls' bathroom and there is a male student she doesn't feel comfortable with, she should walk out and can use the single stall bathrooms,' and 'if she is late to class as a result she could obtain a pass." Doc. 17 at 28. It chose not to. Instead, the Complaint repeatedly alleges the District's policy is that its students can use bathrooms based on their gender identity. Doc. 1 at ¶ 15, 23, 60. Consequently, this Court, when evaluating the Association's Equal Protection Claim, must disregard the Association's twisted recharacterization of the District's bathroom policy in its Response and confine its inquiry to the policy alleged in the Complaint.

Examination of the policy alleged in the Complaint makes clear that the Association has failed to plausibly allege sex discrimination under the Equal Protection Clause because the Association has not alleged the policy imposes a burden on female students that it does not impose on male students by drawing an explicit gender line. *Hayden v. Greensburg*

26

*Cmty. Sch. Corp.*,743 F.3d 569, 579 (7th Cir. 2019). The District's bathroom policy contains no explicit reference to sex and does not draw any distinction between the sexes. Instead, under the District's bathroom policy, all students, regardless of their sex assigned at birth, may use a bathroom that aligns with their gender identity or a single-occupant bathroom. Put more simply, the District's bathroom policy is a facially neutral policy that does not discriminate against female students.

Moreover, the Association has failed to plausibly allege the District's facially neutral policy reflects a sex-based animus sufficient to sustain its sex discrimination claim. *Pers. Adm'r. of Mass. v. Feeney*, 442 U.S. 256, 275 (1979). While the Association claims the bathroom policy only burdens girls in practice, the Association makes no claim that the District's intent was to uniquely burden girls by enacting the policy and not merely a byproduct of the alleged circumstances. Doc. 1 at ¶ 96; Doc. 17 at 26. The Association's Complaint is clear—the District's bathroom policy allows students to use bathrooms consistent with their gender identity. The policy contains no distinctions based on sex. The Association's Equal Protection Claim must be dismissed.

## CONCLUSION

The Association asks this Court to ignore the factual allegations in its own Complaint and the law by requesting that the District's Motion to Dismiss be denied. Under the law, this is not permitted. For the reasons set forth in the District's initial Memorandum of Law and this Reply, the District requests this Court dismiss the Association's claims in their entirety and with prejudice.

27

**SQUIRES, WALDSPURGER & MACE P.A.**

Dated: August 14, 2026

_/s/ Trevor S, Helmers_____
Trevor S. Helmers, Atty. No. 1096386
Elizabeth J. Viera, Atty. No. 1137795
Theo M. Britton, MN Atty. No. 506743
333 South Seventh Street, Suite 2800
Minneapolis, MN 55402
Phone: (612) 436-4300
Fax: (612) 436-4340
trevor.helmers@raswlaw.com
liz.viera@raswlaw.com
theo.britton@raswlaw.com

**ATTORNEYS FOR DEFENDANT**